COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

KEITH IRVING LUESING,

       Defendant-Appellant.

UNPUBLISHED
April 20, 2017

No. 330507
Otsego Circuit Court
LC No. 15-004943-FC

Before: BORRELLO, P.J., and WILDER and SWARTZLE, JJ.

PER CURIAM.

Defendant, Keith Irving Luesing, appeals as of right his jury trial convictions of one count of second-degree murder, MCL 750.317, and two counts of assaulting, resisting, or obstructing a police officer (resisting or obstructing), MCL 750.81d(1). As a fourth-offense habitual offender, MCL 769.12, defendant was sentenced to 50 to 87½ years for his second-degree murder conviction and 388 days (time served) for his resisting or obstructing convictions. We affirm.

I. FACTUAL BACKGROUND

This case arises out of the murder of Troy Walsh (the victim) in his room at a motel (the motel) in Gaylord, Michigan. At the time of his death, the victim had been residing in room 46 of the motel for an extended period. Defendant resided in room 42.

The evening before the victim was murdered, his brother Shawn Walsh (Shawn) visited the victim at the motel. Because the motel staff was planning to paint room 46 the next day, the victim had been informed that he was required to move to the adjoining room 45. Room 45 was, however, occupied by an unidentified man and woman (the unidentified couple) that evening. Accordingly, the brothers made plans for Shawn to come back the next day to help the victim move.

According to the motel manager, on the date of the victim's murder the unidentified couple from room 45 checked out around 10:30 a.m. or 11:00 a.m., turning in their only key for that room. Shawn testified that he arrived at the motel to help his brother move as planned "[s]hortly after noon." Before Shawn arrived, the victim and defendant had been in room 46 alone. The victim was drinking and was visibly intoxicated. Aggravated that, despite their

-1-

plans, the victim "was drinking already before noon on a Sunday," Shawn chided the victim and then left.

The motel manager subsequently went to room 46 to give the victim the key to room 45. After knocking several times on room 46's door and calling out the victim's name, the manager received no response. The door was closed and locked. Thinking that the victim might have moved out, the manager used a master key to enter room 46. It was dark—the drapes had been drawn and no lights were illuminated—but the manager could see somebody "laying in the corner." The person on the floor was later identified as the victim. He had been badly beaten and garroted to death with a lamp cord.

The manager called out the victim's name and he heard defendant, from within the bathroom, announce that he was there. After "a little time," defendant emerged from the bathroom. The manager asked defendant where the victim was, and defendant responded, "I don't know." When the manager asked defendant who the person on the floor was, defendant replied, "I don't know either." Defendant never approached or touched the person on the floor. The manager summoned the police and paramedics to the scene.

The dispatch to the local police units indicated that they were responding to "a possible suicide attempt," but some of the additional information provided by the dispatcher made the incident seem "suspicious." Upon arriving at the scene, the first responding officer, Sergeant Francis Claeys of the Gaylord Police Department, spent approximately 30 seconds performing "a quick protective sweep" of the room, including the bathroom, where he noticed what appeared to be blood that had been diluted by water on both the sink and a soap bottle. Claeys "immediately" asked the manager and defendant whether they had had any contact with the victim's body, and both responded that they had not. Claeys also asked defendant whether he knew the identity of the person on the floor, and defendant "said he didn't know initially." Defendant "had some small lacerations on his hand" and "what appeared to be" blood on the cuticles of several of his fingers.

Trooper Ronald Rabineau of the Michigan State Police (MSP) arrived at the motel shortly after Sergeant Claeys. Defendant was asked to step out of the room and sit on a plastic chair, and he complied.[1] Rabineau began to question defendant "as a potential witness to what may have transpired," but Rabineau did not consider defendant to be under arrest at that time. Defendant, who "appeared to be somewhat intoxicated," told Rabineau that he and the victim had been drinking, that the victim had been "real mad" about having to move rooms, that defendant had gone into the bathroom for about 10 or 15 minutes, that the manager had been entering room 46 when defendant exited the bathroom, and that they had subsequently discovered the victim in the corner of the room. When Rabineau asked defendant whether he had gone "anywhere near" the victim or "had touched him at all," defendant "said that he had not."

---

[1] According to defendant, he sat on the plastic chair because he "hated trying to stand with [his cane," no one was present around him when he sat down, and he was not told that he was under arrest or required to stay.

For roughly the first hour of the investigation, defendant was calm, cooperative, and, in Trooper Rabineau's judgment, not under arrest. After being asked not to use his cellphone, however, defendant became combative and began to make comments indicating that he would fight the officers. The officers ordered defendant to remain seated in the plastic chair. He refused, "tried to stand up," was "taken to the ground," and was placed in handcuffs.

The police noticed "a lot of blood" on defendant's hands, clothing, and boots.[2] Suspicious, Sergeant Claeys began to question defendant more closely, making a video recording of the interrogation. When Claeys and several other officers served defendant with a search warrant entitling them to seize his clothing as evidence, defendant violently resisted. During the ensuing fracas, defendant attempted to bite Claeys several times.

Eventually, Claeys transported defendant to the local police station and placed him in an interview room, where defendant was given his *Miranda*[3] warnings. Defendant indicated that he did not wish to speak with the police, after which MSP Detective-Sergeant David Hart sat "directly across" the interview room's table from defendant and "just looked at him . . . ." Defendant was "very angry," screaming obscenities, and "trying to be intimidating." Among other things, defendant said (1) that he had been a member of the "Bandidos," which was a motorcycle club of which Hart was aware, (2) that he had "been in prison for 17 years," (3) that he had been "involved" in either the death or murder of a Texas Ranger, and (4) that he had worked as an informant for the federal Bureau of Alcohol, Tobacco, and Firearms (the ATF). Hart was under the impression that defendant's statements in the interview room were being video recorded, but no recording was actually made. According to defendant, Hart simply sat across the table from defendant "with a scowl on his face," which made defendant feel like he was "under pressure." Defendant did not remember Hart asking any questions.

Before trial, defendant filed a motion to suppress his statements to the police. Defendant argued that he was in custody for *Miranda* purposes "within minutes, if not seconds, following the police officers' arrival" at the motel. Hence, defendant argued, any statements he made before being advised of and validly waiving his *Miranda* rights should be suppressed. After reviewing the matter,[4] the trial court held that neither defendant's *initial* statements to Claeys and Rabineau nor his later statements to Hart in the interview room were subject to suppression. On the other hand, the trial court held that it would suppress the video-recorded statements defendant made when Claeys later questioned him about his involvement in the murder. The trial court reasoned that, during Claeys's recorded interrogation of defendant, a custodial environment existed because a reasonable person would not have felt free to leave. The trial

---

[2] A sample of the blood found on defendant's pants indicated with "scientific certainty" that the victim was the "major contributor" of DNA in that sample. Samples drawn from defendant's boots and shirt cuff also revealed the victim as the "major" DNA donor.

[3] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

[4] At the parties' agreement, the trial court relied on the record made at defendant's preliminary examination.

court also held, however, that the suppressed statements to Claeys were voluntary and, therefore, could be used to impeach defendant if he testified at trial and offered inconsistent statements.

After defendant testified at trial that he did not believe he ever made a statement to the police denying that he touched the victim's body, the prosecution was permitted, over defendant's objection, to call Claeys as a rebuttal witness in order to impeach defendant with his previously suppressed statements. In the portion of the recorded interrogation that was played for the jury, there was the following exchange between Claeys and defendant:

> *Q*. You told Trooper Rabineau that you -- you didn't have any contact with him; you didn't touch him at all or move him or anything?
>
> *A*. No, no, no, no, man.
>
> *Q*. Okay.
>
> *A*. Troy [the victim] was my friend, man.

At trial, defendant maintained his actual innocence. He testified that, shortly before the victim was murdered, the unidentified couple and another unidentified man (the other man) had forced their way into room 46, upset with the victim for his behavior towards the unidentified woman earlier that day. According to defendant, he was ordered to go into the bathroom and obeyed out of fear, remaining there until the motel manager arrived. Defendant could offer no explanation why he did not inform the motel manager or the responding officers that the unidentified couple and the other man might have been involved in the victim's murder.

Defendant was convicted and sentenced as explained *supra*. This appeal followed.

## II. STANDARDS OF REVIEW

Defendant's several claims of error on appeal implicate varying standards of review. Whether a defendant was subject to a custodial interrogation, and hence entitled to *Miranda* warnings, "is a mixed question of fact and law, which must be answered independently by the reviewing court after review de novo of the record." *People v Coomer*, 245 Mich App 206, 219; 627 NW2d 612 (2001) (quotation marks and citation omitted). The trial court's factual findings regarding a motion to suppress are reviewed for clear error. *People v Elliott*, 494 Mich 292, 300; 833 NW2d 284 (2013). "A factual finding is clearly erroneous if it either lacks substantial evidence to sustain it, or if the reviewing court is left with the definite and firm conviction that the trial court made a mistake." *People v Mazur*, 497 Mich 302, 308; 872 NW2d 201 (2015). Whether a defendant was improperly impeached by evidence taken in violation of his constitutional rights is a question of law reviewed de novo. *People v Clary*, 494 Mich 260, 264; 833 NW2d 308 (2013).

On the other hand, a trial court's evidentiary decisions are reviewed for an abuse of discretion, with any preliminary legal questions concerning admissibility reviewed de novo, *People v Mann*, 288 Mich App 114, 117; 792 NW2d 53 (2010), including whether a statement constitutes inadmissible hearsay, *People v McDaniel*, 469 Mich 409, 412; 670 NW2d 659 (2003). Similarly, "[a] trial court's determination of whether a jury instruction applies to the

facts of the case is reviewed for an abuse of discretion," while any related questions of law are reviewed de novo. *People v McFall*, 309 Mich App 377, 382; 873 NW2d 112 (2015). "The trial court abuses its discretion when its decision falls outside the range of principled outcomes or when it erroneously interprets or applies the law." *People v Lane*, 308 Mich App 38, 51; 862 NW2d 446 (2014).

Unpreserved claims of error are reviewed for plain error affecting substantial rights, with reversal "warranted only when plain error resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of judicial proceedings." *People v Bennett*, 290 Mich App 465, 475-476; 802 NW2d 627 (2010) (quotation marks and citations omitted); see also *People v Pipes*, 475 Mich 267, 274; 715 NW2d 290 (2006). "To avoid forfeiture under the plain-error rule, three requirements must be met: (1) an error must have occurred, (2) the error must be plain, and (3) the error must have affected the defendant's substantial rights, which generally requires the defendant to show that the error affected the outcome of the lower-court proceedings." *People v Buie (On Remand)*, 298 Mich App 50, 56; 825 NW2d 361 (2012). "[R]eversal is only warranted if the defendant is actually innocent or the error seriously undermined the fairness, integrity, or public reputation of the trial." *Pipes*, 475 Mich at 274.

"Where claims of ineffective assistance of counsel have not been preserved, our review is limited to errors apparent on the record." *People v Matuszak*, 263 Mich App 42, 48; 687 NW2d 342 (2004). "Whether defense counsel performed ineffectively is a mixed question of law and fact; this Court reviews for clear error the trial court's findings of fact and reviews de novo questions of constitutional law." *People v Trakhtenberg*, 493 Mich 38, 47; 826 NW2d 136 (2012).

## III. ANALYSIS

### A. SUPPRESSION

On appeal, defendant first argues that the trial court erred by failing to suppress defendant's initial statements to Trooper Rabineau and his subsequent statements to Detective-Sergeant Hart. We disagree in both respects.

> In *Miranda*, the United States Supreme Court held that the Fifth Amendment's prohibition against compelled self-incrimination requires that the accused be given a series of warnings before being subjected to "custodial interrogation." The right to have counsel present during custodial interrogation is a corollary of the right against compelled self-incrimination, because the presence of counsel at custodial interrogation is one way in which to insure that statements made in the government-established atmosphere are not the product of compulsion. If the custodial interrogation is not preceded by an adequate warning, statements made during the custodial interrogation may not be introduced into evidence at the accused's criminal trial. [*Elliott*, 494 Mich at 301 (quotation marks, citations, and footnote omitted).]

"[T]he fact that an individual has become the 'focus' of an investigation does not trigger the *Miranda* requirement." *People v Hill*, 429 Mich 382, 391; 415 NW2d 193 (1987). Instead, "[i]t is well settled that *Miranda* warnings need be given only in situations involving a custodial interrogation." *People v Zahn*, 234 Mich App 438, 449; 594 NW2d 120 (1999). "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Hill*, 429 Mich at 387, quoting *Miranda*, 384 US at 444. "To determine whether a defendant was in custody at the time of the interrogation, we look at the totality of the circumstances, with the key question being whether the accused reasonably could have believed that he was not free to leave." *Zahn*, 234 Mich App at 449. "The determination of custody depends on the objective circumstances of the interrogation rather than the subjective views harbored by either the interrogating officers or the person being questioned." *Id.*

## 1. STATEMENTS TO RABINEAU

Based on the totality of the circumstances, we find no error in the trial court's denial of defendant's motion to suppress his initial statements to Rabineau. First, it is noteworthy that defendant's initial statements to Rabineau were made at the motel where defendant had been residing. "Courts are less willing to find custodial circumstances where interrogation occurs in familiar or neutral surroundings. Thus, interrogation in a suspect's home is usually viewed as noncustodial." *People v Mayes*, 202 Mich App 181, 196; 508 NW2d 161 (1993) (CORRIGAN, P.J., concurring), citing *Beckwith v United States*, 425 US 341; 96 S Ct 1612; 48 L Ed 2d 1 (1976) (holding that a home interview was not "so inherently coercive" as to implicate *Miranda*, and reasoning that the holding in *Miranda* was "grounded squarely" in the unfamiliar, "police-dominated" setting in which most custodial interrogations take place). See also *Minnesota v Murphy*, 465 US 420, 433; 104 S Ct 113; 79 L Ed 2d 409 (1984) ("Many of the psychological ploys discussed in *Miranda* capitalize on the suspect's unfamiliarity with the officers and the environment.").

Second, the questions posed to defendant by Rabineau were the sort of initial fact-finding, on-the-scene questioning that is not governed by *Miranda*. See *Miranda*, 384 US at 477 ("General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding."). While Rabineau was questioning defendant, Claeys was questioning the motel manager. It is clear that the purpose of those interviews was to establish background facts to further the police investigation into the victim's death. That defendant may have become the focus of the investigation during his initial interview does not transform the interview into a custodial interrogation. See *Hill*, 429 Mich at 391 ("[T]he fact that an individual has become the 'focus' of an investigation does not trigger the *Miranda* requirement.").

Finally, defendant has failed to cite any objective evidence indicating that a reasonable person in his situation would not have felt free to leave. A reasonable person, upon encountering the lifeless body of a friend and calling for assistance, will expect that the responding paramedics and police will have questions. A reasonable person will also, however, understand that there is no corresponding obligation to remain at the scene and answer. A civic-minded individual may feel a duty to do so, but there is no compulsion. Indeed, although defendant's subjective understanding is not the proper focus of the instant inquiry—particularly given that he was

-6-

intoxicated—it bears mention that defendant *admitted* at trial that he believed he was free to leave. Under the circumstances, the trial court properly concluded that Rabineau's initial questioning of defendant did not qualify as a custodial interrogation.

## 2. STATEMENTS TO HART

Defendant also argues that the trial court erred by refusing to suppress the statements defendant made in Detective-Sergeant Hart's presence while handcuffed in an interview room. Again, based on the totality of the circumstances, we disagree.

There is no doubt that defendant was in custody when he made the statements in question—he was handcuffed in a police interrogation room. And although he had been advised of his *Miranda* rights, he had evidently indicated that he did not wish to speak to the police, thereby invoking his Fifth Amendment right to remain silent.

In any event, there is no contention that Hart subjected defendant to any express questioning. Instead, according to defendant, Hart simply sat across the table "with a scowl on his face," which made defendant feel like he was "under pressure."

> [T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response. [*Rhode Island v Innis*, 446 US 291, 300-302; 100 S Ct 1682; 64 L Ed 2d 297 (1980) (footnotes omitted).]

Hart's conduct in this case—sitting across from defendant and looking at him, possibly with a scowl—was not behavior that Hart should have known was reasonably likely to elicit an incriminating response[5] from defendant. It is true that defendant was upset and intoxicated, and

---

[5] Because the prosecution sought to introduce it at trial, however, the response actually elicited from defendant in this case qualifies as "incriminating" under the applicable legal definition. See *Innis*, 446 US at 301 n 5 ("By 'incriminating response' we refer to any response—whether inculpatory or exculpatory—that the prosecution may seek to introduce at trial.").

Hart presumably knew as much. Nevertheless, after defendant had just indicated that he was exercising his right to remain silent, Hart had no reason to suspect that, by remaining in the room with defendant and looking at him, Hart would somehow elicit information useful to the prosecution. Accordingly, the trial court did not err by denying defendant's motion to suppress defendant's statements to Hart.

## 3. EVIDENTIARY ARGUMENTS

Intermingled with his claims of error regarding the trial court's suppression rulings, defendant also contends that the trial court abused its discretion by finding defendant's statements to Hart admissible under MRE 401, MRE 403, and MRE 404(b). We disagree.

Defendant's argument regarding MRE 404(b) is entirely misplaced because it regards statements defendant made. See *People v Rushlow*, 179 Mich App 172, 176; 445 NW2d 222 (1989)[6] ("[A] prior statement does not constitute a prior bad act coming under MRE 404(b) because it is just that, a prior statement and not a prior bad act."), citing *People v Goddard*, 429 Mich 505, 515; 418 NW2d 881 (1988). "As the statement of a party opponent, the admissibility analysis involves instead first determining whether the statement was relevant, and second whether its probative value outweighed its possible prejudicial effect." *Goddard*, 429 Mich at 515.

We conclude that the statements were relevant under MRE 401 because the statements tended "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Here, defendant was charged with several counts of resisting or obstructing. With regard to that offense, the prosecution had the burden of proving that defendant (1) "assaulted, battered, wounded, resisted, obstructed, opposed, or endangered a police officer," and (2) "knew or had reason to know that the person that the defendant assaulted, battered, wounded, resisted, obstructed, opposed, or endangered was a police officer performing his or her duties." See *People v Quinn*, 305 Mich App 484, 491; 853 NW2d 383 (2014) (quotation marks and citation omitted). At trial, defendant repeatedly denied that he had done so, alleging that the police brutalized him for no apparent reason. The statements defendant made to Hart—and more importantly, the manner in which he made such statements—constituted circumstantial evidence from which it could be inferred that defendant did, in fact, violently resist the police. Hence, the statements had logical relevance to a fact of consequence in this case.

Furthermore, we perceive no abuse of discretion in the trial court's decision concerning the admissibility of such statements under MRE 403. Although all evidence against a defendant is, by nature, prejudicial to some degree, MRE 403 "does not prohibit prejudicial evidence; only evidence that is unfairly so." *People v Crawford*, 458 Mich 376, 398; 582 NW2d 785 (1998). "Evidence is unfairly prejudicial when there exists a danger that marginally probative evidence will be given undue or preemptive weight by the jury." *Id*. Here, in light of the resisting or

---

[6] Criticized on other grounds by *People v Mayfield*, 182 Mich App 282, 284; 451 NW2d 583 (1990), rev'd 437 Mich 1060 (1991).

obstructing charges against him, the statements defendant made in Hart's presence were certainly probative. Additionally, there is nothing to suggest a danger that such statements would have been given undue or preemptive weight by the jury. On this record, given the balancing nature of the MRE 403 inquiry, and considering that "a trial court's decision on a close evidentiary question ordinarily cannot be an abuse of discretion," *People v Cameron*, 291 Mich App 599, 608; 806 NW2d 371 (2011) (quotation marks and citation omitted), we cannot conclude that the trial court's decision fell outside the range of reasonable and principled outcomes.

## B. OUTSTANDING FELONY WARRANT

While cross-examining Sergeant Claeys, defense counsel asked whether defendant had been placed under arrest during a specific timeframe. Claeys replied, "At that time, I believe we had learned of an outstanding felony warrant for him." Defense counsel moved to strike Claeys's answer as nonresponsive.[7] The trial court did so, admonishing the jury to disregard Claeys's response.

Nevertheless, on appeal defendant contends that he is entitled to a new trial because Claeys's testimony about the outstanding warrant was improper propensity evidence under MRE 404(b). We disagree.

The prosecution concedes this error, acknowledging that Claeys's testimony was improper. Even so, reversal is unwarranted. Even if Claeys's testimony about the felony warrant *did* constitute error, any prejudice was remedied when the trial court struck the testimony and instructed the jury to disregard it. "Jurors are presumed to follow instructions, and instructions are presumed to cure most errors." *People v Petri*, 279 Mich App 407, 414; 760 NW2d 882 (2008). Such presumptions apply "unless there is an overwhelming probability that the jury will be unable to follow the court's instructions, *and* a strong likelihood that the effect of the evidence would be devastating to the defendant." *People v Dennis*, 464 Mich 567, 581; 628 NW2d 502 (2001) (quotation marks and citation omitted; emphasis added). Here, after plenary review of the record, we find no overwhelming probability that the jury would have been unable to follow the court's instructions. Moreover, the prejudicial impact of the evidence was minimal; it was evidence that defendant had an outstanding felony warrant for some unspecified offense. The effect of such evidence was not "devastating" to defendant. Hence, we presume that the trial court's instructions cured the purported error, and defendant is unentitled to reversal.

## C. CROSS-EXAMINATION REGARDING DEFENDANT'S SILENCE

While cross-examining defendant, the prosecution posed the following question:

---

[7] Later, out of the presence of the jury, defense counsel acknowledged that he believed that Claeys's response "was answering [counsel's] questions to a certain extent," further stating that counsel was neither moving for a mistrial nor "making the insinuation that it was done on purpose to try to prejudice the jury."

Wouldn't it be fair to say, sir, that if a person were accused of killing somebody else, especially somebody who, according to your testimony, you had no beef with, you got along with, and you had information that someone else had done something to that person, would it not make sense to you that such a person of [sic] falsely accused would be screaming and yelling from the treetops that they didn't do it?

Defendant objected, arguing that the prosecution's question improperly criticized defendant for relying on his Fifth Amendment right to remain silent. After considering the matter, the trial court sustained defendant's objection to the extent that the prosecution's question commented on defendant's post-*Miranda* silence.

On appeal, defendant again argues that the prosecution's question was improper, this time contending that the impropriety of the question entitles him to reversal. We find no plain error entitling defendant to appellate relief.[8]

As the trial court's ruling suggests, the prosecution's question was not entirely improper, only partially so. It is well-settled that a testifying defendant cannot be impeached by evidence of his or her "post-arrest, post-*Miranda* silence[.]" *Clary*, 494 Mich at 271. Thus, to the extent that the prosecution's question could have been construed as questioning defendant regarding his post-arrest, post-*Miranda* silence, the question was improper.

It is also well-settled, however, that neither the Fifth nor the Fourteenth Amendments are "violated by the use of *pre*arrest silence to impeach a criminal defendant's credibility." *Jenkins v Anderson*, 447 US 231, 238-240; 100 S Ct 2124; 65 L Ed 2d 86 (1980) (emphasis added). Moreover, "where a defendant has received no *Miranda* warnings, no constitutional difficulties arise from using the defendant's silence before *or after* his arrest as substantive evidence unless there is reason to conclude that his silence was attributable to the invocation of the . . . Fifth Amendment privilege." *People v Solmonson*, 261 Mich App 657, 665; 683 NW2d 761 (2004) (emphasis added).

Accordingly, the prosecution's question was largely proper. After defendant chose to testify, it was proper to impeach his credibility by inquiring why, before he was under arrest and advised of his *Miranda* rights, he failed to mention the unidentified couple, the other man, and their supposed involvement in the victim's murder to either the motel manager or the responding police officers. Defendant's pre-*Miranda* silence was also admissible as substantive evidence because there is no indication that such silence was attributable to his desire to invoke his Fifth Amendment privilege. On the contrary, defendant was not silent before or after his arrest—he spoke to the manager and the police at length.

---

[8] "[T]o preserve an issue of prosecutorial misconduct, a defendant must contemporaneously object and request a curative instruction." *Bennett*, 290 Mich App at 475. Defendant timely objected to the prosecution's challenged question, but he failed to request a curative instruction. Thus, this issue is unpreserved.

Because the challenged question was largely proper, defendant has failed to show it constituted *plain* error. Instead, it appears to have been an imprecisely worded question that delved, for the most part, into a proper subject matter. Additionally, in light of the sustained objection to the question and the overwhelming evidence of defendant's guilt, defendant has failed to carry his burden of showing that the purported error was outcome determinative. Consequently, defendant's instant claim of error necessarily fails.

## D. AUTOPSY PHOTOGRAPHS

In the trial court, defendant objected to the prosecution's planned use of numerous photographs from the victim's autopsy. After reviewing the photographs in camera, the trial court excluded "a fair number" from being shown to the jury, including photographs of the victim's genitals and in which the victim's scalp was "pulled back" and "parts of the skull [we]re removed," reasoning that such images had little evidentiary value. The court decided to permit the jury to view "the majority" of the photographs depicting the exterior of the victim's body. Only a few of the autopsy photographs shown to the jury depict the victim's internal anatomy.

On appeal, defendant contends that the trial court abused its discretion by permitting the jurors to view such "gruesome" autopsy photographs. We disagree.

"All evidence offered by the parties is 'prejudicial' to some extent, but the fear of prejudice does not generally render the evidence inadmissible. It is only when the probative value is *substantially outweighed* by the danger of unfair prejudice that evidence is excluded." *People v Mills*, 450 Mich 61, 75; 537 NW2d 909 (1995), mod on other grounds 450 Mich 1212 (1995). "Photographs are not excludable simply because a witness can orally testify about the information contained in the photographs," and photographs may "be used to corroborate a witness' testimony." *Id*. at 76. Moreover, "[g]ruesomeness alone need not cause exclusion." *Id*. Instead, "[t]he proper inquiry is always whether the probative value of the photographs is substantially outweighed by unfair prejudice." *Id*.

Here, the autopsy photographs, although certainly gruesome and thus prejudicial, had undeniable probative value. To prove the second-degree murder charge against defendant, the prosecution was required to demonstrate that he acted with malice, i.e., with "the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and wilful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." See *People v Bergman*, 312 Mich App 471, 487; 879 NW2d 278, 288 (2015). The most visually disturbing photographs were used to corroborate expert testimony regarding the damage to the victim's neck and the degree of force that was exerted to cause such damage. Thus, the autopsy photographs were highly probative regarding the malice element at issue in this case.

It is true that the victim's cause of death was never really in dispute. In other words, there was no genuine dispute at trial whether the victim was murdered, only whether defendant was the killer. Regardless, the trial court's ruling regarding the autopsy photographs did not fall outside the range of reasonable and principled outcomes; rather, it was the sort of discretionary judgment about which reasonable minds might have reached differing outcomes. "The abuse of discretion standard involves more than just a difference of opinion," and "a trial court's decision on a close evidentiary question ordinarily cannot be an abuse of discretion." *Cameron*, 291 Mich

App at 608 (quotation marks and citation omitted). On this record, we cannot conclude that the trial court's ruling regarding the autopsy photographs constituted an abuse of discretion.

### E. ADMISSION OF SEARCH WARRANTS AND THE SUPPORTING AFFIDAVITS

On the second day of trial, the prosecution sought the admission of two search warrants, each of which was supported by an affidavit from an attesting officer. Defendant objected, arguing that the warrants contained inadmissible hearsay. The trial court held that the warrants were admissible and, although it is not clear from the record whether the supporting affidavits were admitted along with the warrants, on appeal the prosecution has acknowledged that the affidavits *were* erroneously admitted into evidence.

On appeal, defendant contends that the trial court erred or abused its discretion by so ruling. We find no error in the admission of the warrants but agree that the affidavits contained inadmissible hearsay.

Search warrants are court orders, *People v Sobczak-Obetts*, 463 Mich 687, 700 n 12; 625 NW2d 764 (2001), and thus are admissible pursuant to MCL 600.2106. The same is not true, however, of affidavits submitted in support of a search warrant. *People v Tanner*, 222 Mich App 626, 630; 564 NW2d 197 (1997). Thus, if the affidavits in this case contained hearsay, MCL 600.2106 did not provide a proper avenue for admission.

MRE 801(c) provides, " 'Hearsay' is a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

> Under MRE 802, hearsay is not admissible unless it falls under one of the hearsay exceptions set forth in the Michigan Rules of Evidence. If, however, the proponent of the evidence offers the statement for a purpose other than to prove the truth of the matter asserted, then the statement, by definition, is not hearsay. MRE 801(c). [*People v Musser*, 494 Mich 337, 350; 835 NW2d 319 (2013).]

Assertions contained in an affidavit seeking the issuance of a search warrant are generally offered to prove the truth of the matter asserted, i.e., to prove that the affiant is actually in possession of information that justifies the issuance of the warrant. See, e.g., *Tanner*, 222 Mich App at 630.

Here, as the prosecution concedes, there are assertions within the challenged affidavits that were evidently admitted to prove the truth of the matter asserted. Further, because the affidavits were prepared as part of the investigation into the victim's murder, they are inadmissible under MRE 803(6) (the business records exception) and MRE 803(8) (the public records exception). See *Solomon v Shuell*, 435 Mich 104, 128-133; 457 NW2d 669 (1990) (opinion of ARCHER, J.); *Tanner*, 222 Mich App at 630. Nor does the prosecution offer any other exception under which the affidavits might have been admissible, and we perceive no valid theory of admissibility. Hence, the trial court erred by admitting the affidavits.

Nevertheless, reversal is unwarranted. "[T]he admission of a hearsay statement that is cumulative to in-court testimony by the declarant can be harmless error, particularly when

-12-

corroborated by other evidence." *People v Gursky*, 486 Mich 596, 620; 786 NW2d 579 (2010). To obtain reversal, the defendant has the burden of demonstrating that, but for the hearsay error, "it is more probable than not that a different outcome would have occurred." *Id.* at 621. Here, the hearsay statements were both cumulative to and corroborated by in-court testimony. Indeed, defendant's own testimony corroborated several of the hearsay assertions in the affidavits, and the affidavits, in turn, corroborated defendant's testimony in several respects. Given the strength and weight of the evidence against him, defendant has failed to demonstrate that the admission of the affidavits was more probably than not outcome determinative.

## F. SURPRISE FINGERPRINT EVIDENCE

On the third day of trial, MSP forensic scientist Thomas Holcomb testified about the forensic investigation performed by the police. On direct examination by the prosecution, Holcomb unexpectedly testified that defendant's fingerprint was found on a soap bottle in room 46's bathroom. Defense counsel objected to the fingerprint evidence on the basis that it had not been provided during discovery, and the prosecution stated that it had been unaware of such evidence. Before the trial court ruled on the matter, the parties entered a stipulation that neither would raise the issue of the fingerprint evidence in any further questioning of witnesses or in argument. The defense stated that it was not requesting a curative instruction regarding the fingerprint evidence.

In his instant appeal, defendant argues that Holcomb's surprise testimony—even if inadvertent on behalf of the prosecution—denied defendant of his due process right to a fair trial. We find no plain error warranting reversal.[9]

Even assuming, for the sake of argument, that the surprise fingerprint evidence constituted plain error, defendant has not carried his burden of establishing that such error prejudiced his substantial rights. Given the testimony that defendant had been in room 46 with the victim drinking before the murder and that defendant was actually in room 46's bathroom when the victim was killed, the presence of defendant's fingerprints on the soap bottle bears no inculpatory import. As such, defendant cannot carry his plain-error burden of showing that the fingerprint evidence was outcome determinative.

Furthermore, "a defendant must raise objections at a time when the trial court has an opportunity to correct the error and cannot harbor error as an appellate parachute." *People v Buie*, 491 Mich 294, 299; 817 NW2d 33 (2012) (quotation marks and citation omitted). Here, the parties' stipulation prevented the trial court from addressing this potential error, as did defendant's decision to forgo a curative instruction. Defendant cannot now use the trial court's failure to issue a ruling as an appellate parachute.

---

[9] Because the parties stipulated to their own remedy for the purported error, the trial court never ruled on this issue. Therefore, it is unpreserved. See *People v Metamora Water Serv, Inc*, 276 Mich App 376, 382; 741 NW2d 61 (2007) ("For an issue to be preserved for appellate review, it must be raised, addressed, and decided by the lower court.").

## G. IMPEACHMENT BY SUPPRESSED STATEMENT

Defendant next argues that the trial court erred by permitting the prosecution, as impeachment evidence in rebuttal of defendant's testimony, to introduce the previously suppressed statement defendant made to Claeys. We disagree. Because it was contrary to defendant's trial testimony, the previously suppressed statement was admissible for impeachment purposes. See *Kansas v Ventris*, 556 US 586, 590-591, 594; 129 S Ct 1841; 173 L Ed 2d 801 (2009) (explaining that, with the exception of "a truly coerced confession," "tainted evidence—evidence whose very introduction does not constitute the constitutional violation, but whose obtaining was constitutionally invalid—is admissible for impeachment.").

## H. ALIBI INSTRUCTION

Defendant argues that the trial court abused its discretion, thereby denying defendant his rights to a fair trial and a properly instructed jury, by denying defendant's request for an alibi instruction. We agree that the trial court abused its discretion by refusing to give an alibi instruction, but we conclude that reversal is unnecessary.

"A criminal defendant is entitled to have a properly instructed jury consider the evidence against him." *People v Riddle*, 467 Mich 116, 124; 649 NW2d 30 (2002). "When a defendant requests a jury instruction on a theory or defense that is supported by the evidence, the trial court must give the instruction." *Id.* Moreover, although a trial court has discretion to exclude alibi *evidence* as a penalty for a defendant's failure to file a notice of alibi pursuant to MCL 768.20, *People v McMillan*, 213 Mich App 134, 140; 539 NW2d 553 (1995), our Supreme Court has "unequivocally stated that if requested, an alibi instruction must be given," even if the supporting evidence was excluded for failure to file an alibi notice or if the alibi defense is supported only by the defendant's uncorroborated testimony, *People v McGinnis*, 402 Mich 343, 345; 262 NW2d 669 (1978).

Alibi evidence is evidence "offered for the sole purpose of placing the defendant elsewhere than at the scene of the crime." *Id.* (quotation marks and citation omitted). "While a defendant's general denial of the charges against him does not constitute an alibi defense, if a defendant gives specific testimony regarding his whereabouts at the time in question, it is alibi testimony the same as if another witness had given the testimony[.]" *Id.* at 346 (citation omitted).

Here, the trial court improperly focused on defendant's sheer proximity to the scene of the murder, refusing to provide an alibi instruction because defendant claimed that he was in the adjacent bathroom at the time of the murder. In other words, the trial court held that it was immaterial that defendant testified that he was in a different room and "behind a closed door" when the victim was killed, reasoning that defendant was nevertheless at the "scene" of the crime for alibi purposes. By so ruling, the trial court erred. As explained by 21 Am Jur 2d, Criminal Law, § 179, "for a credible alibi to exist, the defendant must be at a different place so remote or distant *or under such circumstances* that the defendant could not have committed the offense for which the defendant is being charged." (Emphasis added.) Defendant testified that he was in the bathroom alone, with the door closed and locked, at the time the victim was murdered. In other words, defendant testified that he was in a different place under such circumstances that he could

not have committed the murder; it is impossible to beat someone and strangle them to death through a closed, locked door. By holding, as a matter of law, that such circumstances did not constitute an alibi, the trial court erred. Its error in that regard led it to abuse its discretion by denying defendant's requested alibi instruction.

Notwithstanding, reversal is unwarranted. Under the harmless error rule set forth by MCL 769.26,

> if an applicable instruction was not given, the defendant bears the burden of establishing that the trial court's failure to give the requested instruction resulted in a miscarriage of justice. The defendant's conviction will not be reversed unless, after examining the nature of the error in light of the weight and strength of the untainted evidence, it affirmatively appears that it is more probable than not that the error was outcome determinative. [*Riddle*, 467 Mich at 124-125 (citations omitted).]

Here, defendant has failed to carry his burden of proving that it is more probable than not that the instructional error was outcome determinative. Although the trial court refused to provide an alibi instruction, defendant was permitted to testify about his alibi at trial and the jury was properly instructed about both the presumption of innocence and the prosecution's burden of proving guilt beyond a reasonable doubt. Had the jury found defendant's alibi testimony to be credible, it necessarily follows that the jury would have found the prosecution's proofs regarding the murder to be insufficient. See *People v Burden*, 395 Mich 462, 467; 236 NW2d 505 (1975) (opinion of KAVANAGH, C.J.) ("[I]f the alibi is established, a perfect defense has been shown. Perhaps more importantly, if any reasonable doubt exists as to the presence of the defendant at the scene of the crime at the time the offense was committed (if such presence is necessary to commit the crime), the defendant must also be acquitted."). Again, if defendant was truly in the bathroom as he testified, common sense dictates that he could not have committed the murder offense. Given the weight and strength of the untainted evidence against him, defendant has failed to show that it is more probable than not that the instructional error was outcome determinative.

## I. JURY INSTRUCTION PURSUANT TO MCL 763.9

To the extent that defendant also argues that he was entitled, pursuant to MCL 763.9, to a jury instruction regarding the failure of the police to record defendant's statements to Hart, defendant's trial counsel waived any such argument by stipulating to the jury instructions that were given. "A stipulation constitutes a waiver of any alleged error, so there is no error for us to review." *People v Eisen*, 296 Mich App 326, 328-329; 820 NW2d 229 (2012).

Defendant also contends, however, that his trial counsel performed ineffectively by failing to request an instruction under MCL 763.9 and by waiving any claim of error in that regard.[10] We find defendant's argument unavailing.

"Counsel is not ineffective for failing to advance a meritless position or make a futile motion," *Henry (After Rem)*, 305 Mich App at 141, and Hart was not required to record the statements defendant made in the interview room under MCL 763.8(2). As recently explained in *People v Barritt*, ___ Mich App ___, ___; ___ NW2d ___ (2017) (Docket No. 333206), slip op at 5, "MCL 763.7 is the definitional provision that applies to MCL 763.8[.]" Hence, as used in MCL 763.8, "interrogation" means "questioning in a criminal investigation that may elicit a self-incriminating response from an individual and includes a law enforcement official's words or actions that the law enforcement official should know are reasonably likely to elicit a self-incriminating response from the individual." MCL 763.7(b). In other words, for purposes of MCL 763.8(2), an interrogation includes the same conduct that qualifies as a custodial interrogation under the *Innis* standard. Compare *Innis*, 446 US at 300-302. As we have already explained, Hart did not subject defendant to a "custodial interrogation" as that phrase is defined by *Miranda* and its progeny, including *Innis*. Because Hart did not subject defendant to an "interrogation" under MCL 763.8, as that word is statutorily defined, the failure to record the interview did not violate MCL 763.8 and defendant was unentitled to an instruction pursuant to MCL 763.9. Defendant's trial counsel could, therefore, not have performed ineffectively by failing to request such an instruction.

Additionally, even assuming, arguendo, that counsel *did* perform ineffectively by failing to request an instruction under MCL 763.9, defendant has failed to demonstrate a reasonable probability that, but for counsel's purported error, the result of the proceedings would have been different. The statements that defendant made to Hart, although reflective of defendant's then extant state of mind and probative regarding the resisting and obstructing charges, had no direct inculpatory weight. Furthermore, on cross-examination, defendant's trial counsel effectively impeached Hart about the lack of a video recording, prompting Hart to admit that he had assumed that the interview was being recorded when it actually was not. For those reasons, we conclude that defendant's instant claim of error entitles him to no relief.

Affirmed.

/s/ Stephen L. Borrello
/s/ Kurtis T. Wilder
/s/ Brock A. Swartzle

---

[10] Because defendant failed to duly preserve this issue by filing the requisite motions in the trial court, our review is for any error apparent on the record. See *People v Matuszak*, 263 Mich App 42, 48; 687 NW2d 342 (2004); *People v Sabin (On Second Remand)*, 242 Mich App 656, 658-659; 620 NW2d 19 (2000).